# IN THE UNITED STATES DISTRICT COURT FOR THE
# DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Crim. No. 24-cr-26 (APM)** |
| | : | |
| | : | |
| **TERRY TURNER,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S NOTICE AND MOTION TO
## ADMIT EVIDENCE PURSUANT TO RULE 404(B)

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this notice and moves the Court, pursuant to Federal Rule of Evidence 404(b), to permit the introduction of this evidence. As described in detail below, the government seeks to admit (a) uncharged credit cards, cash, and ledgers from the March 3, 2023 arrest of Turner; (b) Turner's theft of a vehicle from Washington Boulevard Motors, chase from Bordentown, and evidence found in the stolen car; (c) credit card skimmers and additional ID Turner possessed on from March 24, 2023 when returning from Colombia; (d) Turner's use of false identities to fill prescriptions (including communications, photos of prescriptions, and SureScripts/PDMP data); (e) downstream drug distribution evidence; (f) evidence of prior gun possession; and (g) evidence of Turner's possession and other fraudulent use of stolen identifications. The majority of these categories contain evidence that is intrinsic to the charged crimes, but in any event, all of it is admissible to show Turner's motive, opportunity, intent, plan, knowledge, identity, absence of mistake, lack of accident, and consciousness of guilt.

If the government chooses not to use this evidence, or is precluded from using this evidence in its case-in-chief, the government would still seek to use evidence of Turner's other acts as impeachment or rebuttal evidence, should the defense present a case.

## I.    RELEVANT PROCEDURAL HISTORY

On April 17, 2025, a grand jury returned an eight-count Superseding Indictment against Turner, charging him with: Count One, Unlawful Possession with Intent to Distribute Hydrocodone, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C); Count Two, Unlawful Possession with Intent to Distribute Alprazolam, in violation of 21 U.S.C. § 841(a)(1) and (b)(2); Count Three, Unlawful Possession with Intent to Distribute Promethazine with Codeine, in violation of 21 U.S.C. § 841(a)(1) and (b)(3); Count Four, Using, Carrying, and Possessing a Firearm in Furtherance of a Drug Trafficking Offense, in violation of 18 U.S.C. § 924(c)(1)(A)(i); Count Five, Possession with Intent to Use Five or More False Identification Documents to Facilitate a Drug Trafficking Offense, in violation of 18 U.S.C. §§ 1028(a)(3) and (b)(3); Count Six, Aggravated Identity Theft, in violation of 18 U.S.C. § 1028A(a)(1); Count Seven, Wire Fraud, in violation of 18 U.S.C. § 1343; and Count Eight, Interstate Transportation of a Stolen Motor Vehicle, in violation of 18 U.S.C. § 2312.  ECF No. 23.  Trial on these charges is set for August 25, 2025.  This Court ordered the government to file notice of the Rule 404(b) evidence it seeks to introduce by July 17, 2025.  *See* ECF No. 22; Min Order. dated 7/14/25.

## II.    THE CHARGED CONDUCT

Counts One through Five of the Superseding Indictment relate to controlled substances, five false IDs, and a gun found in Turner's vehicle on March 3, 2023.  Counts Six and Seven relate to Turner's March 19, 2025 attempt to fraudulently obtain a lease using a false identity of A.B.[1] Finally, Count Eight relates to Turner's November 30, 2023 police chase between Maryland and D.C. of a white Hyundai Genesis he had stolen by check fraud two months earlier.  Each incident is described in more detail below.

---

[1] To protect the personal information of the victims, the Government will refer to them by pseudonyms throughout this filing.

a. **The March 3, 2023 Accident**

On March 3, 2023, officers of the Metropolitan Police Department ("MPD") responded to a vehicle accident involving Turner and another at the intersection of 15th Street NE and Benning Road NE, Washington D.C.  While on scene, officers observed a prescription pill bottle with the patient's name scratched off in the center console's cup holder of Turner's vehicle and a brown bottle underneath the vehicle.  Upon further inspection of the brown bottle, officers observed it to be a prescription bottle labeled promethazine codeine with the patient's name scratched off.  Turner was placed under arrest.  In total, officers recovered at least six bottles—one containing hydrocodone, three containing detectable amounts of promethazine with codeine, one containing alprazolam pills, and one bottle that was not tested.  Several bottles had ripped labels or patient names belonging to people other than Turner.

  

  

*Images 1 through 6: Clipped images of six bottles recovered from Turner's vehicle or person on March 3, 2023*

During a subsequent search of Turner's vehicle, officers located a Glock magazine in the vehicle's glovebox and an Anderson Manufacturing model AM-15 multi-caliber pistol in the trunk. *See* Image 7.  The pistol was loaded with one .556 caliber round of ammunition in the chamber and twenty-nine .556 caliber rounds of ammunition in the magazine, which was seated in the firearm. *See* Image 8.



*Image 7 and 8: Picture of the AM-15 multi-caliber pistol (left) and .556 ammunition (right) seized from Turner's vehicle on March 3, 2023*

Officers also recovered from the vehicle evidence that Turner was engaged in identity fraud: two fraudulent U.S. passport cards with Turner's image with the name and date of birth of victim O.C.; a fraudulent Pennsylvania driver's license with Turner's image under the name and date of birth of Z.A.; a fraudulent Virginia driver's licenses with Turner's image with the name and date of birth of victim M.S.; a fraudulent Maryland driver's license with Turner's image with the name and date of birth of victim M.J.S.; as well as a Washington, D.C. Driver's license believed to be Turner's. Officers also found ten credit cards in other names—including five for M.S., M.J.S., Z.A., and O.C. *See* Image 9.



*Image 9: Five false identifications and ten credit cards recovered from Turner's car (redacted)*

MPD also recovered over $1,240 in cash, five pharmacy cards under different identities, and two drug ledgers. The ledgers listed names (including Z.A., one of the false identities in Turner's possession), amounts ("300 mL"), drug types ("addy"), and pharmacy addresses across the Eastern Seaboard, and entries crossed out. *See* Images 10 and 11.



*Images 10 and 11: Drug ledgers from Turner's car with various names, drug types, and drug quantities*

### b. The March 19, 2023 Lease Fraud

Based on information obtained from a border search of Turner's phone (described in Part III below), law enforcement determined that Turner was using the email address a*****b*********@gmail.com (the "A.B. Gmail address").  A search warrant of that account revealed that Turner had assumed A.B.'s identity.  Beginning on March 15, 2023, Turner tried to obtain a lease at 1000 South Capitol Street (a property run by Lerner Residential) fraudulently using the A.B. identity.  Specifically, on March 19, 2023, Turner submitted a false application via the leasing portal that listed A.B.'s name, date of birth, and the A.B. Gmail address.  The same day, Turner emailed from the A.B. Gmail address a manufactured pay stub for A.B. from "K.J.K. Productions, LLC."   He submitted as proof of his identity a fraudulent California Driver's license with his image, but A.B.'s name and date of birth.

### c.  The Stolen Hyundai Genesis and November 30, 2023 Police Chase

On September 19, 2023, Turner went to an Arlington, Virginia car dealership, Washington Boulevard Motors, under the alias of D.P., to procure a car by false pretenses.  He provided a Delaware license with his image under D.P's name, completed a credit application, and provided a fraudulent Chase Bank cashier's check under D.P.'s name for $3,500 as a "down payment."  The dealership released the car to him, even though he had not completed the financing.  The car was a white 2013 Hyundai Genesis with a Virginia temporary tag.  Turner returned to the dealership a few days later and provided the dealership another Chase cashier's check for $3,200.  The dealership soon learned the checks were false and, over the next several days, asked Turner via messaging platform to return the car.  After Turner did not respond, the dealership notified the police the car was stolen.

On October 12, 2023, around 1 a.m., a police officer in Bordentown, NJ encountered a white Hyundai with a Georgia temporary license plate parked at a closed business.  Two occupants were sleeping inside.  The officer woke up the occupants and asked for the driver's license.  *See* Image 12.  The driver then hit the gas and fled the scene with the car's lights off.  The car was able to evade police.   Based on the VIN, the police were able to determine that the car was the same one stolen from Arlington and, based on a comparison of the BWC to recent booking photos, that Turner was the driver.



*Image 12: Turner (left) before fleeing police in Bordentown, NJ*

On November 30, 2023, officers with MPD observed the white Hyundai Genesis with the Georgia temporary tag, which appeared as stolen in NCIC. MPD Officers attempted a stop, but the car fled into Prince George's County. Maryland local police then gave chase from Walker Mill Road in Capitol Heights, MD to I-496 to Route 50 to DC-295, with an MPD helicopter overhead. The vehicle finally came to a stop behind 800 Kenilworth Avenue, NE, where the driver fled across all lanes of traffic on 295, through the tree line and onto the train track. The driver identified himself as Terry Turner and had a medication bottle with the name of Terry C Turner on the label. During an inventory of the vehicle, officers located 1 Glock 10mm magazine loaded with 10 rounds of 10mm ammunition, 1 loose 10mm round, 1 Winchester box of ammunition.

On December 5, 2023, Arlington County Police searched the vehicle. Law enforcement recovered, among other things: gift and paypal cards; a 11/7/23 DC parking infraction ticket and a 10/13/23 NY parking ticket for the same temporary license plate; and a debit card and pill bottle in other people's names. Of particular note, law enforcement also found a warranty disclaimer from Washington Boulevard Motors and Virginia power of attorney for the vehicle, a temporary Georgia registration for the car, as well as a fraudulent Chase Bank Cashier's check to Liljenquist

& Beckstead Jewelers for the amount of $9,275. *See* Images 13 through 16.



*Images 13 through 16 (clockwise from top right): Warranty for car signed by D.P.; power of attorney signed by D.P.; Georgia temporary license number for D.P.; and fraudulent check to Lilenquist Jewelers by D.P*

## III.    RULE 404(B) EVIDENCE

### a.  Possession of Additional IDs and Credit Card Skimmers during March 24, 2023 Return from Colombia

The government will seek to introduce evidence and testimony that roughly three weeks after the March 3 incident, on March 24, 2023, Turner was stopped at Dulles International Airport returning from Colombia.  Law enforcement found two additional IDs on Turner's person—a Virginia driver's license under A.J. (with an image of someone other than Turner) and a California driver's license for A.B., with Turner's image.  *See* Exhibit 1.[2]  Turner also had in his possession two credit card skimmers.  *See* Exhibit 2.  Two of Turner's phones were seized, one was successfully searched.   However, police returned the California driver's license and skimmers to Turner.

### b.  Use of False Identities to Fill Prescriptions[3]

Turner has used other identities—some which are contained in identity documents for which Turner has been charged, and some which have not been—to fill fraudulent prescriptions for narcotics at pharmacies across multiple states.  This evidence can be broken down into three sub-categories: (i) photos and videos of other drug ledgers; (ii) communications about or images of prescription fills for other individuals; and (iii) Prescription Drug Monitoring Programs (PDMPs) and SureScripts data of prescriptions actually being filled.

### i.  Other Drug Ledgers

A search warrant of the phones Turner possessed on March 3, 2023 revealed numerous

---

[2] *See* Appendix A, Government's Exhibit List for Rule 404(b) Notice.  The files themselves have been provided to chambers and defense counsel via USAfx.    The exhibits are intended to be representative of a category only; the government reserves the right to supplement with additional exhibits within the same category.

photos and videos of other drug ledgers between July 2022 and March 2, 2023.  Like the ledgers

seized on March 3, 2023, these drug ledgers typically list aliases, personal identifiers (such as dates

of birth), pharmacy addresses, and (sometimes) amounts.  *See* Exhibits 3 through 12.  Five of the

ledgers include the names on identifications for which Turner is charged (Ex. 3-4, 6, 8, 9, and 12),

and six ledgers list D.P. (Ex, 5. 7, 8, 9–11), an identity that appeared on one of the ledgers seized

on March 3, 2023.

### ii.  Communications about or photos of prescription fills for other individuals

The Government expects to introduce evidence that Turner worked with others to fill

diverted prescriptions from Dr. Ndubuisi Okafor[4] under false names at pharmacies across the

Eastern Seaboard.  Turner's phone contains photographs (dated September 29 and November 20,

2022, respectively) of what appear to be electronic prescription submissions from Dr. Okafor under

Turner's name and under D.P.'s name.  Ex. 13 and 14.  Turner's phone also contains a video of

Turner holding a pill bottle under the name M.S., an identity for which Turner has been charged.

*See* Ex. 15.  Finally, Turner's phone and social media contain direct conversations showing

Turner's use of identities to fill diverted prescriptions:

- Between March 9 and 18, 2023, Turner texted with a number ending in -9628, believed to be the receptionist for Dr. Ndubuisi Okafor.  On March 9, 2023, Turner provided a list of individuals—including Z.A. (charged), D.P. (not charged), and China Moore (not charged)—requesting "DOB" for each.  The -9628 number returned the list with DOBs completed.  Turner says "I need china[ Moore's] pharmacy."  The -9628 number sends Turner a screenshot of the submitted pharmacy information for China Moore.  On March 16, 2023, in -9628 texted Turner, "Dept oh Health Investigators where just in here so it's hecked that's why I had told you come in," and Turner responds, "Wth They still in there?"  On March 18, 2023, Turner texts -9628 with an update, "Zewde Kabtymer needs verify, M[]S[] doctor only sent in muscle relaxers needs to send oxy. All the other pharmacys

---

[4] *United States v. Ndubuisi Joseph Okafor*, 23-CR-116 (JDB) (D.D.C.).  Dr. Okafor was convicted by a jury of Conspiracy to Distribute Controlled Substances (21 U.S.C. § 846), Maintaining a Drug Involved Premises (21 U.S.C. § 856) and 22 counts of Distribution of a Controlled Substance (Outside the Legitimate Practice of Medicine), and was sentenced to 18 years' incarceration. Turner was referenced throughout trial as an uncharged co-conspirator.

closed." *See* Ex. 17.

- On March 17, 2023, Turner requested two individuals' names and date of births from a number ending -6850 ("send name and dob"). The counterparty sent the names and two dates of birth with the suffix "OXY," meaning oxycodone, as well as a driver's license photo for one of the people, Antonio Smith. Turner then sends the -6850 number photos of what appears to be an online confirmation that "oxycodone HCl 10 MG PO Tablet" and "Cyclobenzaprine HCl 5MG PO Tablet prescriptions were electronically submitted for Smith. *See* Ex. 18.

- On March 30 and 31, 2023, Turner (using the Nothkickr Instagram account) messaged with "jujunae," known to be Okafor's receptionist. On March 30, after video chatting, Turner sends jujunae a list of aliases, including Z.A. Jujunae sends back the same list with dates of birth for most of them. Jujunae says she is "about to the leave the office," and Turner says "[I]f you got a acc[ount] I can do $6K." The following day, Turner tells jujunae to "resend" M.S. and another alias, and "verify" a third alias "they calling now." Turner also warns "antonio [Smith] no go." Later, Turner asks that Smith's prescription and a prescription for Kaymon Evans be sent to a particular Connecticut Stop & Shop; jujunae asks "Send this cash app so he can do some of this work before he leave/Cause he ready to go." Jujunae later warns Turner, "They said they not going to fill she didn't say why." Ex. 19.

### iii. PDMP and SureScripts

The government also intends to introduce data from Prescription Drug Monitoring Program (PDMP) and Surescripts regarding prescriptions in Turner's name or one of his aliases. SureScripts data shows a healthcare provider's electronic submission of a prescription to a pharmacy, regardless of whether it is filled. PDMP is a state-by-state database of controlled substance prescriptions that reflects only filled prescriptions. The Government has subpoenaed PDMP data for 9 states (DC, MD, VA, NY, CT, NJ, DE, GA, NC), as well as SureScripts data, for sixteen names (Turner plus 15 suspected aliases) from August 1, 2022 to January 18, 2024 (the date of Turner's arrest). Of the 15 aliases, six (A.B., O.C., M.S., M.J.S., Z.A., and D.P.) are identities that are were used in conduct that is charged conduct in Counts Five through Eight of the Superseding Indictment. The government will seek to elicit limited testimony and evidence about a number of uncharged transactions (transactions related to other names on the drug ledger found in Turner's car on March 3, 2023), in addition to the transactions that are the subject of

Counts One through Three.

### c. Drug Distribution

The government also intends to introduce evidence and testimony about communications Turner had about drug distribution. Specifically, the government will introduce evidence that, between May 2020 and October 2023, Turner advertised and sold "lean" (also known as "drink")[5], promethazine-codeine, alprazolam (referred to as "footballs" or "bars" depending on the shape of the pills), and other prescription drugs. A summary of that evidence follows:[6]

- In May 2020, Turner (through Instagram handle notchkickr) advertised to user fatdrippp, "I got drink n percs." In September 2020, fatdrippp inquired, "Drink?," and in response Turner sends a photograph of a bottle in a seatbelt. *See* Ex. 20.

- In January 2021, Turner advertised to user_deleted_bhiebeacgffbeccec, "Wock n tris around," and negotiated a price. Wockhardt and Tris Pharma are promethazine-codeine manufacturers. Ex. 21.

- A July 4, 2020 Instagram conversation between Turner using the Instagram handle, notchkickr, with user dc_exotticss. After negotiating for marijuana "zips", Turner then says that he can "f[*ck] w[ith] y[ou]" on "drink," and then sends two photos of what appears to be prescription bottles of promethazine codeine. *See* Ex. 22.

- In September 2022, Turner and user y.tkdulf negotiate the price for an "8" as "600"; "600 & 800 PTs hot"; Turner brags, "I just sent 9 [8s] out of town." Ex. 23.

- In March 2022, Turner re-posts a meme titled the "Drug Dealer Never Consumes," captioning the photo "& people ask me why." Ex. 24.

- In July 2022, Turner and user belal2.o negotiate several drug deals. For instance, in July 14, Turner asks belal2.o whether he "fw the wax while you sippin" and, on July 15 Turner says he is bringing "Tris" and "[marijuana] wax." Ex. 25.

- Between June 2022 and October 2022, Turner appears to repeatedly sell promethazine-codeine to user sneeze_shiesty. On July 20, 2022, Turner advertises a price of "175" for "wocky," *i.e.* Wockhardt pharma. On August 15, 2022, Turner appears to deliver to deliver "tris." On October 2, 2022, Turner sends sneeze_shiesty images of both what appears to be a bottle of promethazine-codeine. On October 13, 2022, Turner sends sneeze_shiesty an image of empty Crush bottles, saying that "I do [have lean]". Ex.

---

[5] Lean is a mix of cough syrup (usually promethazine-codeine or sometimes hydrocodone) and soda that sometimes includes alcohol, and hard candies. It can be sold by the capful.

[6] The Government has provided the conversations in full in the exhibits for context.

26.

- On October 16, 2022, Turner tells user kevoyevo that "canarys in on Tuesday."[7]  On November 9, 2022, Turner asks kevoyevo to "Lmk if you ever come across yellow bars," meaning alprazolam. Ex. 27.

- On January 16, 2023, Turner posts a December 30, 2022 image of him making lean in a car.   He jokingly captions the photo, in part, "They ain't gon never be off that cap 🧢 like they got a bald spot 🥴"  In other words, Turner is advertising the quality of his lean.  Ex. 28.

- A January 27, 2023 image from Turner's cellphone depicts an apparent advertisement for promethazine-codeine for $450 to $2,000 and "Tris Syrup" and "$top [emoji] trying be cool [emoji] shyt gotta be in you not on you [emojis for 'no cap']." Ex. 29.

- On February 19, 2023, Turner posts a photo of him holding what appears to be lean. He captions the photo, "I den washed my hands so much that I'm ashy 😮 👈 #findmypeace #canary"  Ex. 30.

- In a March 13 to 15, 2023 text conversation on Turner's phone, number ending -1143 tells Turner, "Need to a hit a fat pharma bra," and "Ordered footballs to Marlboro Pike cvs 90 cou[n]t remind me" and "See if u can get on that hotel for me bra I'm trying duck off in thwre."  On March 15, 2023, Turner texts –1143 "2033 M St NW, Washington, DC 20036," which the address of a D.C. hotel. Ex. 31.

- On March 5, 2023, user breezyrmg asks Turner, "You got drank?"  Turner responds, "I just had everything & lost it all 😂😂just got out," and "Tuss red wock n Tris 10,15,20s."  On April 2, 2023, Turner advertises to breezyrmg, "red tris pai" at a price of "150/165/175."  They pair negotiate, landing on a price and quantity of "4 or better [bottles of tris at] 165".   Ex. 32.

- On February 14, 2023, user n_ahim asks Turner, "U got them bars or what foo?," and Turner says, "nuff said."  On March 4, 2023, n_ahim says, "Wtf I just hit you too." Turner says, "everything gone".  On March 20, 2023, n_ahim asks, "U got some Bars", Turner replies "Yea".  On April 2, 2023, n_ahim asks, "U got bars ?" and "U still in town," to which Turner replies "Yea."  N_ahim says "Need some more yellows."  Ex 33.

- On November 16, 2022, Turner asks beezah.g4g, "You seen dem yellow thangs around," to which they reply, "Na I only get bars from u or my other man I be buying footballs n shit."  On April 18, 2023, Turner tells beezah.g4g, "Canarys" and "I got em." Ex. 34.

- On January 21, 2023, after gomechoo___ tells Turner "We're dat drink twin" and asks,

---

[7] Turner later explains that "canary" is his slang for yellow bars, believed to alprazolam based on the shape of the pill.

"You got my green Lis," Turner says "Tris you want one pt?" Ex. 35.

- In February 2023, Turner negotiates purchasing "bars" from topgass1.5.  In April 2023, topgass1.5 asks if Turner says "seals," meaning sealed bottles.  Turner responds, "10 a red & a 2 8s a tris."  They negotiate on price.  Ex. 36.

- On June 27, 2023, Turner tells stepper, "I'm ready 2 send 2 one drink one perc" "I got pharms too."  In early July 2023, Stepper also agrees to put Turner in touch with the "new okafor," that he is "filling with" every day for "$500 since he paper only."  Ex. 37.

- In August 2023, user 100taerock tells Turner, "Need juice😠😠," and Turner responds that he has "20s [yellow round pills] and drink."  In October 2023, Turner appears to advertise additional drugs.  Ex. 38.

- In October 2023, Turner tells user cvsdiamond, "I get hotels n flights if y need," and "& I only got 3 Canarys left I need you this weekend seriously."  Cvsdiamond asks, "what's canarys?, and Turner responds, "Yellow bars."  Cvsdiamond says, "Yeah I have dem😎" Ex. 39.

- In June 2023, Turner sends user rick.jamez  a photo of two bottles of Tris pharma promethazine-codeine. Ex. 40.

### d.  Prior Gun Possession

The government anticipates introducing evidence of other instances where Turner has possessed firearms.  Specifically, the government anticipates introducing two photographs from Turner's phones or social media depicting Turner holding guns (guns other than the AM-15 recovered on March 3, 2023) with metadata of January 27 and 29, 2023.  *See* Ex. 41 through 42.

### e.  Possession and Other Fraudulent Use of False Identities

The government also intends to introduce evidence of other instances where Turner had either possessed or used false IDs, subdivided into: (i) Turner's use of M.J.S.' name for hotel stays; (ii) Turner's attempt to use the O.C. identity for lease fraud; (iii) the Turner's attempt to use A.B.'s identity for an attempted DARCARS fraud; (iv) Turner's attempt to use the A.B. identity for lease fraud; and (v) Turner's use of the D.P. ID in an attempted jewelry theft.

### i.  February 2023 Hotel Stays under M.J.S.' Name

Law enforcement obtained a search warrant of Gmail accounts associated with Turner. Specifically, those accounts contained evidence that Turner had used M.J.S.'s name on credit card authorization forms for DC-area hotels between February 17, 2023 and February 24, 2023.  See Exhibits 43 through 44.

### ii. February 2023 attempted lease fraud under O.C.'s name

The government intends to introduce evidence that Turner used the O.C. identity to attempt to commit rental fraud for the City Ridge Apartment in February 2023.  Specifically, one of Turner's phones from the March 3 stop contains an image of a February 3, 2023 letter from an apartment complex City Ridge to O.C. (a charged ID), declining his application.  *See* Ex. 48.  In a photo dated February 4, 2023, Turner is depicted holding up a California driver's license with O.C.'s name on it – apparently the same one he was caught with at the border on March 24, 2023.  *See* Ex. 46.  Turner also appeared to have submitted the O.C. passport card to a verification platform, RightID, based on a February 9, 2023 photo.  *See* Ex. 47.

### iii. March 19, 2023 Use of the A.B. Identity in Attempted DARCARS Fraud

On or around March 19, 2023, Turner (via the A.B. identity) reached out via the internet to the DARCARS of Rockville Car Dealership in Rockville, MD, expressing interest in purchasing a used 2016 Jaguar XJ.  The salesperson began corresponding via email with A.B. though the A.B. Gmail account.  The salesperson requested that A.B. provide proof of identification and (according to the interview of the salesperson) employment.  *See* Ex. 49.  On March 20, 2023, Turner emailed a photo of a California Driver's License under the name A.B. and a leave and earnings statement under the same name from the company K.J.K. Productions, LLC.  See Ex. 49, 49A through D. A.B. also created an application for financing of the vehicle, though it is unclear when it was submitted.  *See* Ex. 50 (page 9).  The transaction was not completed because, according to the

salesperson, A.B. did not respond to requested follow up verifications.

### iv.  May 2023 Attempted Lease Fraud Using the A.B. and O.C. Identities

The government will also seek to introduce evidence that Turner used both the O.C. and A.B. identity to attempt to commit another lease fraud.[8]  Specifically, on or about April 25, 2023, Turner (using the A.B. identity) appears to have submitted an application to the apartment complex at 4283 South Capitol Street SW in Washington, DC for a May 1 start date.  Ex. 51.  The property manager, Elyse Property Management, followed up by email and phone, requesting a copy of the government ID, social security card, and bank records.  *Id.*  On May 1, 2023, Turner sent the property manager "the documents you requested. including a snapshot of my bank balance, a copy of my social security card, and ID," adding "I would like to sign the lease today if possible."  *Id.*  Turner attached the California Driver's license for O.C. (likely in error), Ex. 51A; screenshot of a card statement for A.B., Ex. 51B; the back of a license for A.B., Ex. 51C, and a photo of the social security card for A.B., Ex. 51D.  Later that day, Turner sent an email with a photo of a California driver's license for A.B.  Ex. 52, 52A.

### v.  Attempted Theft from Liljenquist Jewelers

On October 23, 2023, Turner, under the D.P. alias, tried to buy a watch from Liljenquist and Beckstead Jewelers located in Tyson's Corner, Virginia, using an out-of-state personal check.  *See* Ex. 53.  The jeweler did not allow the sale.  At some point, they appeared to scan the D.P. ID, which failed on a scan.  Ex. 54.  According to a representative from the jeweler's, Turner relayed he would return with a cashier's check.  As noted above, a fraudulent Chase Cashier's Check from D.P. for $9,275 addressed to Liljenquist and Beckstead Jewelers was found in the car following the November 30, 2023 chase.  *See* Image 16.

---

[8] The Government has selected only two of several other instances where Turner appears to have attempted to defraud an apartment complex.

## IV.    LEGAL STANDARD

Under Fed. R. Evid. 404(b), evidence of other crimes, wrongs, or acts is not admissible to show conformity, but may be admissible for any non-propensity purpose, such as demonstrating "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *See* Fed. R. Evid. 404(b)(2). The D.C. Circuit has emphasized that Rule 404(b) is a rule of "inclusion rather than exclusion." *United States v. Bowie*, 232 F.3d 923, 929 (D.C. Cir. 2000). The restrictions of Rule 404(b) apply only to acts "extrinsic" to the charged offense. In contrast, acts that are "intrinsic" fall outside the scope of Rule 404(b). *United States v. McGill*, 815 F.3d 846, 879 (D.C. Cir. 2016) (per curiam); *Bowie*, 232 F.3d at 929.

An act is intrinsic if it "(a) is part of the charged offense; (b) is offered as direct evidence of the charged crime; or (c) was performed contemporaneously with the charged crime and facilitated" it. *United States v. Roberson*, 581 F. Supp. 3d 65, 72 (D.D.C. 2022). Intrinsic evidence includes evidence "offered as direct evidence of a fact in issue, not as circumstantial evidence requiring an inference regarding the character of the accused." *United States v. Alexander*, 331 F.3d 116, 126 (D.C. Cir. 2003). This is a "narrow" set of acts that excludes evidence merely necessary to, for instance, "complete the story" or "explain the circumstances" surrounding a crime. *Roberson*, 581 F. Supp. 3d at 71 (cleaned up); *see United States v. Bowie*, 232 F.3d 923, 928 (D.C. Cir. 2000). "The well-established rubric in this Circuit for distinguishing intrinsic from extrinsic evidence rests largely on temporal proximity. . . ." *See United States v. Thorne*, No. CR 18-389 (BAH), 2020 WL 122985, at *13 (D.D.C. Jan. 10, 2020).

The admissibility of Rule 404(b) evidence is evaluated using a two-pronged test. First, the evidence must be "probative of a material issue other than character," *i.e.,* one of the listed purposes above. *United States v. Miller*, 895 F.2d 1431, 1435 (D.C. Cir. 1990) (citation omitted). Second, the evidence must be admissible under Rule 403, which permits exclusion only if its

probative value is "substantially outweighed" by the danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.  *See Id*. at 1435.   "In undertaking the Rule 403 analysis, the district court must 'take account of the full evidentiary context of the case as the court understands it when the ruling must be made.'"  *United States v. Martin*, No. CR 24-196, 2025 WL 1905645, at *6 (D.D.C. July 10, 2025) (quoting *Old Chief v. United States*, 519 U.S. 172, 182 (1997)).   The D.C. Circuit has recognized that the risk of Rule 404(b) evidence can be mitigated through appropriate limiting instructions.  *United States v. Bell*, 795 F.3d 88, 100 (D.C. Cir. 2015) ("[T]he district court issued limiting instructions to mitigate the danger of undue prejudice or improper inferences. There is nothing to suggest the jury ignored the court's instructions.").

## V.    ARGUMENT

The Government breaks its notice into the following seven categories of evidence: (a) the uncharged credit cards, cash, and ledgers from March 3, 2023; (b) the theft from Washington Boulevard Motors, Bordentown chase, and evidence from the stolen car; (c) the credit card skimmers and additional ID from March 24, 2023 from the return trip from Colombia; (d) use of false identities to fill prescriptions (including communications, photos of prescriptions, and SureScripts/PDMP data); (e) downstream drug distribution evidence; (f) evidence of prior gun possession; and (g) evidence of possession and other fraudulent use of stolen identifications. The majority of these categories contain evidence that is intrinsic to the charged crimes.   In the alternative, however, all of this evidence is admissible for permissible Rule 404(b) purposes.

### a.    Uncharged Credit Cards, Drug Ledgers, and Cash from March 3, 2023 Are Intrinsic, or in the Alternative, Demonstrate Knowledge, Intent, Identity, Motive, Plan, Absence of Mistake

The ten credit cards, two drug ledgers, and $1,240 cash recovered from Turner and his vehicle on March 3, 2023 are intrinsic to the charged offenses, or in the alternative, probative of

knowledge, intent, identity, plan, motive and the absence of a mistake.

Counts One through Three charge Turner with possession with intent to distribute hydrocodone, alprazolam, and promethazine with codeine, respectively, on March 3, 2023. Count Five charges Turner with the possession of five false identification documents (two O.C. passport cards, and driver's licenses for M.S., M.J.S., and Z.A.) in furtherance of a drug trafficking offense.

As a threshold issue, all of this evidence—the ten credit cards, two drug ledgers, and $1,240 cash—are intrinsic to the charged crimes. Specifically, this evidence is part of the charged offenses because they are "intrinsic part of the witness' account of the circumstances surrounding the offense for which [Turner] was indicted," *i.e.* the March 3, 2023 arrest, and all recovered from Turner or his vehicle on the same day. *United States v. Allen*, 960 F.2d 1055, 1058 (D.C. Cir. 1992).

The $1,240 cash on Turner's person is also intrinsic because it is direct evidence of the charged crimes in Count One through Three (*i.e.,* Unlawful Possession With Intent to Distribute Hydrocodone/Alprazolam/Promethazine with Codeine). Typically, large amounts of cash are an indicator of narcotics distribution. In the alternative, the cash shows Turner's intent to distribute, a required element of Counts One through Three and a permissible Rule 404(b) purpose.

The two drug ledgers found in the car are also intrinsic because they are contemporaneous with and facilitate the charged drug offenses. Specifically, the drug ledgers are a tool that Turner used to facilitate the illegal purchasing of narcotics. *See United States v. Bowie*, 232 F.3d 923, 929 (D.C. Cir. 2000) ("Some uncharged acts performed contemporaneously with the charged crime may be termed intrinsic if they facilitate the commission of the charged crime.") (citing 22 Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure* § 5239, at 446-7 (1978) (noting that the "inseparable crimes" interpretation of Rule 404(b)'s

"other" crimes language "seems justifiable when used to cover situations where the seller of contraband must necessarily be shown to have [purchased] it. . . ."). In order to "facilitate," an act must "promote, help forward ... [or] assist in bringing about [ ]a particular end or result." *Facilitate*, Oxford English Dictionary (3d ed. 2009). Facilitation thus requires some sort of causal nexus between the intrinsic act and the charged crime. *See United States v. Roberson*, 581 F. Supp. 3d 65, 73 (D.D.C. 2022). In this case, the drug ledgers are the link between the narcotics in the car and the identities—that Z.A.'s name was on one ledger shows that Turner's possession of that ID was committed to facilitate a drug trafficking crime, a required element of Count Five. In the alternative, the drug ledgers have three permissible Rule 404(b) purposes: (1) they show that Turner acted with intent to unlawfully use the false identification documents in his possession for purposes of Count Five; (2) they show that Turner intended to distribute the narcotics he possessed for purposes of Counts One through Three; and (3) as the link between the narcotics and the IDs, they show that Turner's possession of the IDs was no mistake.

Turner's possession of the ten credit cards is intrinsic to the conduct charged in Count Five because the possession was both contemporaneous with and facilitated the charged crime, and the five credit cards in charged identities are direct evidence of the charged crime. Here, Turner's possession of fraudulent credit cards could have facilitated his possession of the charged identities (for instance, having one identity could make accessing or creating false identities easier). *See, e.g., United States v. Lackey*, No. 1:17-CR-269, 2019 WL 6464656, at *5 (M.D. Pa. Dec. 2, 2019) (applying the *Bowie* rule and holding that "the act of sending a text message inquiring about the availability of firearms facilitates the later possession of firearms"). It is also notable that *half of those credit cards are in the names of identities charged in Count Five*—which is direct evidence that Turner was the one who possessed the charged identifications in their name.

In the alternative, Turner's possession of these credit cards proves Turner's intent and knowledge, permissible purposes under Rule 404(b).  For Count Five, the Government must prove, among other things, that Turner knowingly possessed with intent to use the five charged IDs unlawfully.  18 U.S.C. § 1028(a)(3).  Turner's possession of all ten credit cards tends to make it more likely that when he possessed the charged IDs, he did so with the intent to use them unlawfully—for instance, to use the false credit cards or create new ones.   They also show that Turner's possession of the charged IDs was not a mistake; that Turner was the person who possessed them; that Turner had the motive and plan to possess the charged IDs (that he could use the IDs for financial gain).

All of this evidence survives Rule 403 balancing.  This evidence is extremely probative of what Turner intended on March 3, 2023, the same day he possessed the identities, gun, and narcotics charged in Counts One through Five.  *See United States v. Bell*, 795 F.3d 88, 100 (D.C. Cir. 2015) (prior bad act "occurred relatively close in time to the conduct charged in the indictment, thereby increasing the probative value of the 404(b) evidence") (internal citation omitted).  And his possession of drug ledgers, credit cards, and cash is no more sensational than his possession of the identifications charged in Count Five, and far less so than his charged possession of drugs and guns in Counts One through Four on the very same day.  *See United States v. Wilkins*, 538 F. Supp. 3d 49, 78 (D.D.C. 2021) ("Bad acts evidence is typically 'not barred by Rule 403 where such evidence did not involve conduct any more sensational or disturbing than the crimes with which the defendant was charged.'" (quoting *United States v. Fuertes*, 805 F.3d 485, 494 (4th Cir. 2015) (cleaned up)).  Should the Court be concerned the jury might reach improper inferences based on Turner's possession of credit cards in the names of other identities, or the drug ledger's listing of those other identities, the Court can give an appropriate limiting instruction, consistent with well-

established law.

**b. Circumstances of Theft from Washington Boulevard Motors, Bordentown Chase, and Other Evidence from the Stolen Car is Intrinsic, and In the Alternative, Shows Common Plan and Intent.**

The circumstances around Turner's theft by false pretenses of the Hyundai Genesis from Washington Boulevard Motors in September 2023, Turner's October 12, 2023 flight from the Bordentown police, and other evidence obtained from the car on November 30, 2023 are intrinsic because they are part of the charged offense or direct evidence of the crime charged in Count Eight, Interstate Transportation of a Stolen Motor Vehicle. To prove this charge, the government must show that the Defendant: (1) unlawfully transported or caused to be transported in interstate or foreign commerce; (2) a stolen motor vehicle; (3) knowing the same to be stolen.

The circumstances of Turner's theft of the vehicle from Washington Boulevard Motors in September 2023 is part of the charged offense. Specifically, the government must show that the vehicle was stolen, and the circumstances of the theft are necessary for the government to establish that it was. *See United States v. Coughlin*, 821 F. Supp. 2d 35, 45 (D.D.C. 2011) (determining that evidence of the defendant's medical and athletic activities constituted intrinsic evidence of the charged offense of making a fraudulent claim to the September 11th Victim Compensation Fund). In the alternative, such evidence is relevant for a clear non-propensity purpose under Rule 404(b) —proving Turner's knowledge that the vehicle was stolen.

Similarly, Turner's flight from Bordentown, NJ police is direct evidence of the charged offense. Specifically, the evidence establishes the third element—that Turner transported the car interstate. Even if not intrinsic, the evidence is admissible for a non-propensity purposes— Turner's consciousness of guilt. "Consciousness of guilt is a recognized permissible use for evidence under Rule 404(b)." *United States v. Abu Khatallah*, No. 14-cr-141 (CRC), 2017 WL 11493960, at *5 (D.D.C. Sep. 7, 2017). Flight from law enforcement "is not necessarily indicative

24

of wrongdoing, but it is certainly suggestive of such." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000).  Here, Turner's successful flight from Bordentown police in the stolen Hyundai in the middle of the night—almost hitting an officer in the process—is highly probative of his consciousness of guilt.  *See United States v. Morrow*, No. 04-cr-355 (CKK), 2005 WL 3159572, at *28 (D.D.C. Apr. 7, 2005) (evidence of defendant's flight from law enforcement would show "consciousness of guilt relating to the underlying offense.")

Finally, the evidence obtained from the car on November 30, 2023 is intrinsic because it is both part of the charged conduct and is direct evidence of the crime charged in Count Eight. Specifically, the November 7, 2023 DC parking infraction ticket and the October 13, 2023 NY parking ticket for the same temporary license plate is direct evidence that Turner had transported (i.*e.* driven) the stolen car in interstate commerce for at least two months.  Similarly, the warranty disclaimer from Washington Boulevard Motors and the Virginia power of attorney for the vehicle are evidence that it is the same car stolen from that dealer in September 2023.[9]  Furthermore, this evidence also supports that the stolen car travelled in interstate commerce.  In the alternative, this evidence serves a permissible Rule 404(b) purpose—Turner's knowledge that the car was stolen.

This evidence survives Rule 403 balancing.  The circumstances of the theft from Washington Boulevard is essential evidence to the Government's case-in-chief on Count Eight; it is expected to come in through testimony and documents, providing little reason to inflame a jury. Similarly, "[n]othing about the flight evidence, either in the form of photos, testimony, text messages, or jail calls, is tinged with emotion or unfair biases, and, rather, as the government argues, no evidence of personal injuries or severe property damage is involved."  *Martin*, No. CR

---

[9] The cashier's check to Liljenquist & Beckstead Jewelers for the amount of $9,275 will be addressed below.  The Government does not intend to introduce evidence of the ammunition recovered from that vehicle.

24-196, 2025 WL 1905645, at *9.  Finally, the documentary evidence recovered from the car on November 30, 2023 is also more anodyne than the conduct charged and thereby carries less potential to shock the jury's conscience.  *See Wilkins*, 538 F. Supp. 3d at 78.

### c.  Credit Card Skimmers and the A.B. ID from March 24, 2023 Is Intrinsic, But If Not Shows Opportunity, Motive, Identity, Knowledge, and Intent

On March 24, 2023, law enforcement stopped Turner at Dulles airport (on a return trip from Colombia) and observed him in possession of a false California driver's license for A.B., an identity of another person, and two credit card skimmers.  Ex. 1 & 2.  This evidence is intrinsic, or the alternative, offered to prove opportunity, motive, plan, identity, knowledge, knowledge, and intent.  *See United States v. Crowder*, 141 F.3d 1202, 1208 (D.C. Cir. 1998) ("Rule 404(b) evidence will often have such multiple utility, showing at once intent, knowledge, motive, preparation and the like.").

As an initial matter, Turner's possession of the A.B. driver's license is direct evidence of the charged crimes.  Turner is charged in Counts Six and Seven with aggravated identity theft and wire fraud in connection with his submission of an apparently identical California Driver's license with A.B.'s name to Lerner residential on March 19, 2023.  Accordingly, Turner's possession of the same driver's license just five days later is direct evidence of both charges. *See United States v. Alexander*, 331 F.3d 116, 126 (D.C. Cir. 2003) (affirmative response to "He got a gun on him now?" is direct evidence of the gun crime).  In the alternative, however, Turner's possession of these items shows opportunity, motive, and plan.  His possession of what appears to be the same ID shows his opportunity (that he had the opportunity to submit it) and motive (to fraudulently obtain leases).  Turner's possession of the credit card skimmers shows plan—it gives one possible explanation of how Turner was in possession of so many credit cards a few weeks before, on March 3, 2023 (*i.e.,* to skim information from them or to encode them).

Evidence of the stop itself also shows identity. While the Defendant has not yet raised an identity defense, the government anticipates that the Defendant may dispute whether Turner was the user of A.B. Gmail account from which the fraud and aggravated identity theft in Counts Six and Seven was perpetrated. Should defense raise the issue, Turner's possession of the same ID in Dulles Airport five days later would deflate any defense that Turner was not the individual who submitted the ID.

Finally, the evidence shows intent and knowledge. Specifically, the Government must prove for Count Six, among other things, that Turner knowingly transferred, possessed, or used the A.B. identity without lawful authority, and for Count Seven, that Turner acted with the intent to defraud Lerner Residential when he submitted the false application. Turner's possession of the A.B. driver's license shows his knowing possession of the A.B. identification on March 19, and his possession of that ID with credit card skimmers—a tool commonly used to create fraudulent credit cards or steal information—tends to show that Turner acted with the specific intent to defraud. *See United States v. Fitzsimons*, 605 F. Supp. 3d 92, 101 (D.D.C. 2022) ("In order to be relevant, the Government's proposed Rule 404(b) evidence does not have to *prove* the Defendant's intent, it need only make it more probable that the Defendant possessed the requisite intent." (quoting *United States v. Hite*, 916 F. Supp. 2d 110, 117 (D.D.C. 2013))).

This evidence also survives Rule 403 balancing. Given the proximity to the charged conduct in Counts Six and Seven—less than five days later—the probative value is extremely high. Turner's possession of another identity card or credit card skimmers here is not more sensational or disturbing than the gun or possession of other identifications for which Turner is charged. *See Wilkins*, 538 F. Supp. 3d at 78. "The language of [Rule 403] tilts, as do the rules as a whole, toward the admission of evidence in close cases. . . .In determining whether 'the probative value

27

is substantially outweighed by the danger of unfair prejudice' it is a sound rule that the balance should generally be struck in favor of admission when the evidence indicates a close relationship to the event charged." *United States v. Moore*, 732 F.2d 983, 989 (D.C. Cir. 1984).

### d.  Use of False Identities to Fill Prescriptions in Intrinsic, but in the Alternative Shows Motive, Common Plan, Intent, and Knowledge

The evidence that Turner used aliases on other occasions to fill prescriptions is intrinsic to the controlled substances crimes in Counts One through Three.  In the alternative, each category of evidence is relevant to motive, common plan, intent, and knowledge.

First, the photographs of other drug ledgers in Turner's phone show common plan, intent, and knowledge.  *See* Ex. 3–12.  These exhibits show numerous other occasions where Turner sought to fill prescriptions under the names for which Turner is charged with a false ID (Exs. 3, 4, 6, 8, 9, 12), or an identity that is listed on the drug ledger found on March 3, 2023 (D.P., Exs. 5, 7, 9, 10, 11).  This shows Turner's common plan and motive for using false identities—to fill prescriptions at different pharmacies under various aliases, presumably so he does not attract attention.  Each time Turner previously listed a name that is charged on a ledger makes it more likely that he acted with the intent unlawfully to use the false identification documents on March 3, 2023, and also that the presence of those identities was intended to further drug trafficking (both required elements of Count Five).  The number and quantities of drugs on the ledgers also show Turner's intent to distribute for purposes of Counts One through Three; *i.e.* they do not indicate personal use.

Second, Turner's communications with others about and photos of prescriptions fills for other individuals are relevant to Turner's motive, common plan, and intent.  Turner's photographs of a failed prescription for himself (Ex. 13), electronic prescription for D.P. (Ex. 14, an alias on the drug ledger), video of a pill bottle for M.S. (Ex. 15), and an electronic prescription for Z.A.

(Ex. 16, a name on the drug ledger and a charged ID) all show  motive and common plan—that Turner would use these false identities to fill prescriptions and then pick them up at pharmacies nationwide (as the drug ledger indicated).  These exhibits in particular show one source of those prescriptions—Dr. Okafor.  *Cf. Okafor*, 2024 WL 4263928, at *7 ("photographs of medications apparently taken in Okafor's examination room, are intrinsic, as they provide direct evidence of an act—solicitation of customers—taken during and in facilitation of the conspiracy").  Although they date between September 2022 and January 2023, they have some bearing on Turner's intent to distribute the narcotics he possessed (Counts One through Three), as well his intent to use the identifications he possessed on March 3, 2023 in furtherance of drug trafficking (Count Five).

The communications deepen that connection.  In early March, Turner received from a receptionist for Dr. Okafor's office dates of birth for multiple aliases, including charged alias Z.A., follow-up prescription confirmation for one of those aliases, and requests "oxy[codone]" for M.S., another alias.  Ex. 17.  On March 17, Turner repeated the same with an unknown individual for two other aliases, following a similar pattern.  Ex. 18.  And on March 30, the officer manager again sent Turner dates of birth for multiple aliases, including Z.A.  Ex. 19.  On March 31, Turner requested that the manager resend M.S. and verify the prescription of another alias.  *Id.*  These provide the link between the false identities that Turner procured and the prescription narcotics that Turner possessed; all are relatively close in time to the March 3, 2023.  In short, they bear heavily on Turner's intent for the narcotics and identifications he possessed on that date.  *See United States v. Olaitan*, No. CR 21-0713 (PLF), 2023 WL 4993525, at *5 (D.D.C. Aug. 4, 2023) ("[Defendant's] state of mind is the 'crux of this case.' [Defendant's] participation in prior distressed real estate transactions is relevant to his state of mind during the charged offenses— evidence of his prior conduct will help the jury determine what [defendant] knew, should have

known, and intended to accomplish during the [] property transactions . . . [and] relevant to the jury's determination as to whether the charged offenses occurred because of [defendant's] purposeful conduct rather than because of accident or mistake.").

Fourth, the government intends to introduce limited PDMP and SureScripts data concerning the drugs found in the car and the identities on the ledger found in the car. This will both be direct evidence of Turner's possession (they will provide details who filled the prescription) and bear on his intent to distribute for Counts One through Three (*i.e.* drugs that are contra-indicated are not usually prescribed together for personal use). Similarly, the PDMP and SureScripts data concerning the names on the drug ledger found in Turner's car on March 3, 2023 will tend to make more likely his intent to use the false IDs found in his car to further drug trafficking (for purposes of Count Five).

All of the evidence above survives Rule 403 balancing. In weighing the Rule 403 analysis, the Court must "take account of the full evidentiary context of the case as the court understands it when the ruling must be made." *Old Chief v. United States*, 519 U.S. 172, 182 (1997). Here, Turner is essentially part of a trafficking ring—Turner would work with individuals in Dr. Okafor's office to arrange for false prescription fills at pharmacies nationwide under false identities, and then use ledgers to keep track of the prescriptions he needed to pick up. As such, the relevance of this information is very high—it connects the inner machinations of how Turner got and filled prescriptions to his false IDs. Although there is some risk the jury may make impermissible inferences of Turner's involvement in an uncharged conspiracy, this can be limited by appropriate jury instructions. *See McGill*, 815 F.3d at 889 ("[W]e have repeatedly noted with approval jury instructions that identify the *specific* purpose for which a particular piece of 'other crimes' evidence has been admitted."); *Fitzsimons*, 605 F. Supp. 3d at 102 (collecting cases on the

value of *voir dire* and limiting instructions in mitigating potential prejudice).  Given the close relationship to the charged offenses in Counts One through Five, the Rule 403 should generally be struck in favor of admission.

> **e.  Drug Distribution Evidence Shows Opportunity, Plan, Knowledge, Intent, Lack of Mistake, and Identity**

The ample drug distribution evidence in this case (Ex. 20 through 40) shows opportunity, plan, knowledge, intent, and lack of mistake.  Some also show identity (Ex. 32, 33).

 "The D.C. Circuit has consistently allowed the admission of other crimes[,] [wrongs, or acts] evidence relating to possession of drugs and firearms under Rule 404(b) to demonstrate knowing possession and absence of mistake." *United States v. Williams*, 507 F. Supp. 3d 181, 191 (D.D.C. 2020) (collecting cases).   As the D.C. Circuit has explained:

> A Defendant's hands-on experience in the drug trade cannot alone prove that he possessed drugs on any given occasion. But it can show that he knew how to get drugs, what they looked like, where to sell them, and so forth. Evidence of a defendant's experience in dealing drugs—evidence, that is, of his "bad acts"—thus may be a "brick" in the "wall" of evidence needed to prove possession.

*United States v. Crowder*, 141 F.3d 1202, 1209 (D.C. Cir. 1998); *United States v. Thorne*, No. CR 18-389 (BAH), 2020 WL 122985, at *11 (D.D.C. Jan. 10, 2020) (prior drug trade can also show opportunity and access). "[T]he principles governing what is commonly referred to as other crimes evidence are the same whether the conduct occurs before or after the offense charged." *United States v. Latney*, 108 F.3d 1446, 1450 (D.C. Cir. 1997) (internal quotations and citations omitted).

Here, Turner's social media evidence shows that between May 2020 and October 2023, Turner advertised, solicited, and sold narcotics, including lean ("drink"), promethazine-codeine (charged in Count Three), alprazolam (charged in Count Two and also described as "canarys," "bars" or "footballs"), or other drugs.  Some evidence involves coded drug talk (*see, e.g.,* Exs. 23,

36, 39); others involve negotiations over amounts and prices (*see, e.g.*, Exs. 21, 32); and still others show Turner simply bragging or advertising the quality of his drugs (Ex. 28–30).  All of these exhibits, however, go directly to show that, on March 3, 2023, Turner intended to distribute the narcotics he possessed (for Counts One through Three), that his possession was knowing (for Counts One through Three), that he had access to drugs and a common plan to distribute them, and that his possession on March 3 was not a mistake.  In two of the messages—Exs. 32 and 33—Turner directly talks about the charged incident—including he "just had everything & lost it all" and "Tuss red wock n Tris 10,15,20s".  These particular messages also show identity—that Turner is the user of the notchkickr Instagram account from which he is attempting to distributing drugs. In short, all of these messages are not just relevant, but highly probative of a core issue in the case. *See United States v. Martin*, No. CR 24-196, 2025 WL 1905645, at *10 ("Defendant's various messages prior to the March 7, 2024, controlled delivery advertising boot for sale, naming prices, and coordinating location and time for meetups …are not only relevant' but also highly probative of, his knowledge and intent with regard to the crime charged" (citations and quotation marks omitted, cleaned up)).

The probative value of the evidence is not substantially outweighed by the danger of unfair prejudice or cumulative evidence under Rule 403.  As the D.C. Circuit has acknowledged, "the admission of prior possession-with-intent-to-distribute evidence almost unavoidably raises the danger that the jury will improperly conclude that because the defendant committed some other crime, he must have committed the one charged in the indictment." *United States v. Pettiford*, 517 F.3d 584, 590 (D.C. Cir. 2008 (cleaned up, citations and quotation marks omitted).  "But [t]his danger…cannot give rise to a *per se* rule of exclusion." *Id.*  Here, however, the evidence provides a keen insight into Turner's state of mind with respect to the prescription narcotics he possessed

on March 3, 2023.  *Id.* ("Rule 403 'does not bar powerful, or even 'prejudicial' evidence."").  The proffered evidence "involve[s] similar drugs to the present case, similar storage methods, and the like, have significant probative value regarding [Turner's] intent, preparation, plan, knowledge, ... absence of mistake, [and] lack of accident—all of which are permissible, noncharacter purposes. *United States v. Moore*, 75 F. Supp. 3d 444, 451 (D.D.C. 2014).  And there is nothing about the exhibits suggesting "compelling or unique" evidence of prejudice that cannot by jury instruction. *Id.*

Nor is this evidence cumulative.  It is true that some of the messages (Ex. 20 through 26) date between six months to almost three years prior to the March 3, 2023 incident, and others date almost seven months after (Ex. 39).  The Circuit has found that even an eight-month gap between charged conduct and Rule 404(b) evidence was appropriate.  *See Latney*, 108 F.3d at 1450 (D.C. Cir. 1997) (holding, under Rule 404(b), that admission of an eight-month gap between charged conduct and subsequent drug possession was appropriate because while "the more distant the time between two events the less likely the events are connected," "[s]o long as the evidence makes a fact of consequence more or less likely, it is relevant" ).  However, Rule 404(b) contains no *per se* rule that a prior bad act is too old to be admissible.  *United States v. Rodriguez*, 215 F.3d 110, 120 (1st Cir. 2000).  Given that these twenty exhibits each explain something different about Turner's dealing, the evidence is not cumulative. *United States v. Brown*, 597 F.3d 399, 407 (D.C. Cir. 2010) (holding not cumulative to use five Rule 404(b) witnesses to testified about different occasions when defendant used fictitious financial documents and was warned they were worthless, from which a reasonable jury could infer his intent).  Especially where the evidence goes to a central issue of the case, the Court should tilt towards admission.  *See also United States v. DeLoach*, 654 F.2d 763, 769 (D.C. Cir. 1980) ("[T]he court must consider the government's

need for the evidence in making its case. On the issue of intent, which is far harder to prove by extrinsic evidence than Holland's identity or the falsity of the statements, the government's need for the evidence is correspondingly greater.").

### f.   Prior Gun Possession Shows Intent, Knowledge, Lack of Accident

The Government seeks to introduce two photos, from January 27 and 29, 2023 (five weeks before the March 3, 2023 incident) of Turner possessing other guns. Ex. 41 and 42.  To prove Count Four, which charges Turner with violating 18 U.S.C. § 924(c), the government will need to show that Turner knowingly possessed the AM-15 pistol, and that Turner's possession of the pistol was in furtherance of a drug trafficking crime.  These two photos show that Turner's possession of another gun (less than five weeks later) was knowing and was not an accident.  *See Cassell*, 292 F.3d at 795 ("conclud[ing] that evidence of Cassell's prior gun possessions was relevant to show his knowledge of and intent to possess the firearms recovered from his bedroom"); *United States v. Anderson*, 174 F. Supp. 3d 494, 499 (D.D.C. 2016) (conditionally admitting prior gun possession in constructive possession case).  Moreover, the fact that Turner posted one of these photos on his Notchkickr Instagram account (Ex. 42) tends to show that his possession of a gun on March 3, 2023 was in furtherance of his drug trafficking.  *Moore*, 75 F. Supp. 3d at 451 (evidence of prior gun possession could be used to show intent regarding the use of the recovered gun in 18 U.S.C. § 924(c) prosecution ).  While "evidence of prior gun possessions may be prejudicial in a subsequent trial for gun possession" evidence, it is not so prejudicial that the jury cannot be trusted to follow the Court's limiting instruction.  *Cassell*, 292 F.3d at 795 (approving of limiting instruction).

### g.   Possession and Other Fraudulent Use of Stolen Identifications Shows Knowledge, Intent, Motive, and Plan

Finally, Turner's possession and other frauds using the identifications he is charged with

possessing on both March 3, 2023 and March 19, 2023 shows Turner's knowledge, intent, motive, and common plan.

First, Turner's use of the M.J.S. name to book hotel stays in February 2023 demonstrates his intent. Ex. 43–44. To prove Count Five, the government will need to show, among other things, that Turner possessed with intent to use the M.J.S. driver's license on March 3, 2023. Turner's use of the name to book hotel stays less than a month prior makes it more likely that when Turner possessed the driver's license under the same name, he did so with the intent to use it. It also shows his motive—as demonstrated in Ex. 31, Turner would sometimes book hotels for drug customers. One possible motive of possessing these IDs would be to book hotel rooms as a temporary dealing location.

Second, Turner used both O.C. and A.B.'s identities to attempt to defraud other apartment complexes in the D.C. area, both in February 2023 and on May 1, 2023. Ex. 46–48, 51–52. The government will need to show, among other things, that Turner knowingly possessed O.C.'s passport card with intent to use it on March 3, 2023 for purposes of Count Five, that Turner knowingly possessed A.B.'s California driver's license on March 19, 2023 for purposes of Count Six, and that he intended to defraud Lerner Residential for purposes of Count Seven. Turner holding up O.C.'s California's driver's license (Ex. 46) (the same one he was seen with at the border on March 24, 2023), a photo of the passport card submitted to RightID (Ex. 47), and his contemporaneous submission of a lease application (Ex. 48) all show Turner's knowing possession and intent to use the passport card. Similarly, Turner's use of the A.B. ID six weeks after his lease fraud with the same ID shows his knowing possession of that identification and that he acted with intent to defraud Lerner Residential on March 19. These instances also show a common plan, namely that Turner would use these IDs to try to secure an apartment.

Third, Turner's March 19, 2023 use of the A.B. identity in the DARCARS fraud shows knowledge and intent for the same reasons as described above.  Ex. 50.  Here, however, the relevance link is stronger given that the DARCARS fraud took place a day before the charged lease fraud.  And it also shows common plan—sending a false ID—that he would later use for his theft of the Hyundai Genesis in September 2023.

Fourth and finally, Turner's October 23, 2023 attempt to purchase a watch from Liljenquist and Beckstead Jewelers as D.P. (Ex. 53, 54) shows knowledge, plan, and absence of mistake.  Specifically, it tends to show that Turner knew he stole the car from Washington Boulevard Motors that is the subject of Count Eight, because he gave the same ID to Liljenquist and Beckstead Jewelers and was found with another false check to them in his vehicle.  For the same reason, it shows common plan and absence of mistake.  *See Brown*, 597 F.3d at 405 (holding that previous incidents where bank counsel and Secret Service agent warned defendant that his bogus financial documents were worthless and their use was illegal were relevant to defendant's prior knowledge, motive, and absence of mistake or accident).

These other instances of financial fraud have probative value in anticipating and undercutting any innocent explanation for the charged conduct.  *See United States v. Long*, 328 F.3d 655, 661 (D.C. Cir. 2003) (holding that evidence relevant "to show a pattern of operation that would suggest intent and that tends to undermine the defendant's innocent explanation" is admissible under Rule 404(b) (internal quotations omitted), *abrogation on other grounds noted by United States v. Mohammed*, 89 F.4th 158 (D.C. Cir. 2023)).  And there is no apparent reason why any such prejudice could not be cured by an appropriate jury instructions.

## VI.    CONCLUSION

The majority of the categories described above contain evidence that is intrinsic to the charged crimes.  If, however, the Court disagrees, there evidence is properly admitted for

permissible Rule 404(b) purposes, and its probative value of the evidence is not substantially outweighed by its potential prejudice.

Respectfully submitted,
JEANINE FERRIS PIRRO
United States Attorney

By:        */s/ Michael L. Barclay*
MICHAEL L. BARCLAY
Assistant United States Attorney
N.Y. Bar Reg. No. 5441423
601 D Street, N.W., 5.230
Washington, D.C. 20530
(202) 252-7669
michael.barclay@usdoj.gov

`

PETER V. ROMAN
Assistant United States Attorney